# INTELLECTUAL PROPERTY INSURANCE SERVICES CORPORATION

July 2, 2004

10503 Timberwood Circle, Suite 114
Louisville, Kentucky 40223
502/429-8007
FAX 502/429-0994
www.infringeins.com

Ms. Ellen Efros
Rader Fishman & Grauer, PLLC
Lion Building
1233 20th Street NW, Suite 501
Washington, D.C. 20036

**PRIVILEGED AND CONFIDENTIAL**

RE:  Insured:     Coupons, Inc.
     Policy#:     190153-D03
     Plaintiffs:  Black Diamond CCT Holdings & E-Centives, Inc.
     Claim#:      190153-C03

Dear Ms. Efros:

    I am writing to address Coupons, Inc. Claim Form, which was received by Intellectual Property Insurance Services ("IPISC") on January 23, 2004, and certain supporting documents received thereafter and through May, 2004, which taken as a whole, request authorization on behalf of Coupons for reimbursement of LITIGATION EXPENSE arising from a lawsuit initiated by Black Diamond CCT Holdings, LLC and E-Centives, Inc. (collectively referred to herein as "Black Diamond"). Having now reviewed much of the information you have provided, we are writing to express the Company's position with regard to coverage related to the suit by Black Diamond.

    Indian Harbor Insurance Company issued an Intellectual Property Infringement Defense Cost Reimbursement Policy Number 190153-D03 to Coupons, Inc. effective for the policy period of August 10, 2003 to August 10, 2004. The Policy provides a limit of liability of $5,000,000 per claim, and $5,000,000 in the aggregate, subject to a 20% coinsurance participation and a $500,000 self-insured retention obligation. The Policy generally provides that Indian Harbor will reimburse Coupons for LITIGATION EXPENSE incurred by Coupons arising out of COVERED LITIGATION authorized by Indian Harbor. The Policy provides coverage solely for COVERED LITIGATION responding to allegations of INFRINGEMENT of products specifically scheduled on the SCHEDULE OF INSURED MANUFACTURED PRODUCTS endorsement to the Policy. That schedule provides the following description:

> The insured product is an electronic coupon distribution system described and claimed in US Patent Application Serial No. 09/451,160 by Coupons, Inc. including but not limited to the following additional preemptive limitations and features to wit a system which 1) provides for a consumer to download and print a coupon at home (as distinguished from in stores)



- 1 -

IN 005880

via the internet by inputting a United States Postal Service zip code as the only personal identification information, thereby allowing the consumer to remain totally anonymous; b) does not provide that data regarding the selections of the consumer are forwarded to a retail outlet; c) does not provide that the data regarding the selections may be redeemed over the internet; d) contains all of the limitations and assumed characteristics and features recited in the opinion letter thereon by Ronald Kananen of Rader, Rishman [sic] & Grauer on August 7, 2001.

At this time, I would like to draw your attention to several provisions of the Policy. The Policy provides on the first page that "The company will only accept and consider CLAIMS on CIVIL PROCEEDINGS alleging INFRINGEMENT which CIVIL PROCEEDINGS are commenced no sooner than ninety (90) days after the beginning of the POLICY PERIOD, and thereafter during the POLICY PERIOD, or unless this Policy has been renewed or terminated, on CIVIL PROCEEDINGS alleging INFRINGEMENT which CIVIL PROCEEDINGS are commenced within ninety (90) days after the end of the POLICY PERIOD." The term POLICY PERIOD is defined as the period from the Effective Date shown on the Dec page to the expiration date shown thereon.

The Policy specifies the means by which an Insured must submit a CLAIM. The term CLAIM is defined as:

> a demand on the Company by the Named Insured on the Company as properly completed and executed 'Infringement Defense Claim' form to have a CIVIL PROCEEDING alleging INFRINGEMENT or any part thereof deemed COVERED LITIGATION and for written acknowledgement that LITIGATION EXPENSE and DAMAGES (if designated on the Declarations Page) resulting from the COVERED LITIGATION will be reimbursed under this Policy. CLAIM does not refer to the actual CIVIL PROCEEDING brought against the Named Insured.

The Insurance Policy Renewal Endorsement, effective August 10, 2003 specified the timing required with regard to filing a CLAIM. Quoting item number four of that Endorsement, "All rights to make a CLAIM under the previous Policy shall terminate as of the termination date of said previous Policy and the Company will not accept any such CLAIM submitted to it thereafter." Item number five states "The Company will accept and consider CLAIMS made under this Renewal Policy on CIVIL PROCEEDINGS alleging INFRINGEMENT which CIVIL PROCEEDINGS are commenced at any time during this Renewal POLICY PERIOD."

The result of the Renewal Endorsement is that occurrences within a POLICY PERIOD must be reported as a CLAIM within that POLICY PERIOD, or those rights to make a CLAIM are terminated. The CIVIL PROCEEDING in this case was a lawsuit filed against Coupons, Inc. by Black Diamond on November 14, 2002. Frederick Paonessa of Crump E&S of San Francisco forwarded a letter to IPISC dated December

IN 005881

16, 2002 from Ellen Efros to Michael Reever of Marsh Advantage, notifying him of the lawsuit, and asking him to notify Indian Harbor. Although Mr. Paonessa sent IPISC notice of a lawsuit on December 23, 2002, within the 2002-03 POLICY PERIOD, this notice did not amount to notice of a CLAIM. The requirement of a completed Claim Form in order to put the Company on notice of a CLAIM is not unduly burdensome. The requirement was clearly outlined to Coupons, Coupons' counsel, and Coupons' broker in December 2002. Consistent with the Policy, in his December 27th letter Mr. Charles Baxter to Coupons' CFO, Fracis Serafin, specified in bold type, and underlined, "**<u>Please note, only our receipt of our claim form can constitute notice to us of a CLAIM</u>**." He also expressed concern about approving the firm of Rader, Fishman and Grauer as litigating counsel in the case. He suggested that Coupons would want to propose litigating counsel for approval by the Company as soon as possible, if it intended to file a CLAIM, and reserved the right to refuse coverage for litigation expense incurred through the use of counsel that was not approved. Mr. Baxter copied Coupons' counsel and Coupons' broker on this correspondence. Coupons at that point had eight and one-half months to file a CLAIM before the expiration of the Policy. In May, having not received a Claim Form, IPISC claims personnel compared the asserted patents to the Product Description in the Schedule of Insured Manufactured Products. It appeared that the scope of the patents did not cover the Scheduled product, and IPISC concluded that the suit likely did not involve the Scheduled Product, and therefore that Coupons was unlikely to submit the Black Diamond matter as a CLAIM.

Standard industry practice seems to be that brokers tender claims to all of the Insured's carriers, putting the burden on the insurance companies to sort out irrelevant claims. As such, IPISC receives notice of lawsuits against Insureds which suits could never amount to a CLAIM, as they fall well outside the scope of coverage. The Policy specifies twice that a CLAIM must be submitted in the form of a Claim Form provided by the Company, both in the definition of a CLAIM, and also as the first Condition in the Conditions section of the Policy. This requirement is intended in part to sort irrelevant notices of suit from legitimate CLAIMs.

Aside from the actual notice and contractual agreement by Coupons regarding how to put the Company on notice of a CLAIM, practical aspects would also suggest that notice of a CLAIM should include a demand more than simple forwarding of a lawsuit. Mere notice of a lawsuit by an Insured does not amount to notice of a CLAIM, because notice of a lawsuit does not provide basis by which to estimate whether the suit falls within the potential scope of coverage. <u>Employers Reinsurance Corp. v. Phoenix Ins. Co.</u>, 186 Cal.App.3d 545, 555 (1986) ("...there is an inherent difference between the 'making' of a claim and the 'bringing' of a lawsuit. The former, by its very nature, involves some kind of notice. The latter only requires the filing of a complaint."). Notice of a claim implies an assertion, or a challenge of something as a right, or the assertion of a liability of some service or sum or money. <u>Safeco Surplus Lines Co. v. Employers Reinsurance Corp.</u>, 11 Cal.App.4th 1403, 1407 (1992). The Intellectual Property Infringement Defense Cost Reimbursement Policy addresses only a narrow portion of commercial liability, further supporting the notion that notice of a lawsuit filed against an Insured does not amount to notice of a CLAIM. The Policy is particular not

IN 005882

only to specific allegations, in this case, patent infringement, but also is limited to allegations regarding a specifically scheduled product.

IPISC sent a Notice of Non-Renewal in 2003, and invited Coupons to re-apply for another year of coverage to begin on August 10, 2003. During the re-application process, IPISC noticed that Coupons responded under item three of the application concerning Claims, "on file w/ company." IPISC reviewed the information on file with the Company, which merely included notice of a suit, and which preceded Mr. Baxter's clear letter regarding the means to put the company on notice of a CLAIM. IPISC underwriters also checked the progress of the suit on the PACER service, and noted that that the case was reassigned in May, and no further documents had been filed in the past three months. It was also noted that Coupons continued to utilize counsel that Mr. Baxter had expressed doubt about approving. Prior to the expiration of the 2002-03 policy in August, Erik Weisenhahn, an IPISC customer service representative, verified with Coupons' wholesaler, Greg Franc of Crump Insurance, that Coupons did not intend, and would not, file a CLAIM on the Black Diamond suit. This confirmed IPISC's interpretation that the failure to submit a Claim Form reflected Coupons' intention not to submit a CLAIM. IPISC underwriters took these facts into account in offering coverage and in setting the premium for the following year, and offered coverage without an increase in premium that would have reflected increased risk in the market for CLAIMs. IPISC also considered excluding the Black Diamond suit outright on the 2003-04 policy, but based upon Mr. Franc's comments, and the supporting facts and circumstances, believed the exclusion to be unnecessary, and also redundant, based upon the language in the Renewal Endorsement.

It was not until November 19th, a full year after the litigation had incepted, that Greg Franc again called Mr. Weisenhahn at IPISC, this time to verify that the carrier was "okay with the CLAIM." Mr. Weisenhahn responded "What CLAIM?" The claims department responded in the same way. By this time, the opportunity to file a CLAIM on the suit incepted in 2002 had elapsed by the terms of the Policy and the Renewal Endorsement. Robin Fletcher, Chuck Baxter, and Robert Fletcher pointed this out to Steven Boal, Frank Serafin, and Jeff Weitzman of Coupons, and Mike Reever, a broker at Marsh Advantage, on a teleconference on December 17th, 2003. At that time, it was also suggested that Coupons might have a claim against Mr. Franc's E&O policy. As a result of the teleconference, IPISC understood Coupons to be undecided about whether to file a Claim Form, being on notice that the Company would probably not accept a CLAIM at that late date for the lawsuit filed more than a year prior, and that the Company would probably deny coverage.

The Policy is a "claims made" policy, and according to the Policy terms, a CLAIM must arise and actually be submitted to the Company within the POLICY PERIOD. Under claims made policies, even if events occur during the policy period which might give rise to valid claims, there is no coverage if claims or potential claims for those occurrences are not made and reported to the insurer during the period specified in the policy. *See, eg.*, Pacific Indemnity Co. v. Imperial Cas. & Indemnity Co., 176 Cal.App.3d 622, 626 (1986). One of the features of claims made policies is the actuarial

4

certainty, which enables an insurer to attain a level of predictability unattainable under standard occurrence policies. An indispensable component of that predictability is the ability of the Insurer to close its books on a policy, and to be more precise in calculating its necessary reserves and future premiums. Burns v. International Insurance Co., 709 F.Supp. 187 (N.D. Cal. 1989). In the case of intellectual property insurance, claims made policies translate into the possibility to write the risks at all, in spite of the violation of the law of large numbers.

As noted above, CLAIM is defined in the Policy as a demand on the Company by the Named Insured on the Company's properly completed and executed "Infringement Defense Claim" form. Coupons made no demand on the Company during the applicable POLICY PERIOD, although it had specific instructions and ample time to do so. The facts and circumstances, including statements made by Coupons' wholesale agent, led the Company to believe that no CLAIM would be made. Most states, including California, have upheld claims-made provisions of insurance contracts, finding they fulfill a legitimate interest not in conflict with public policy. See, eg., Civic Asoc., Inc. v. Security Ins. Co. of Hartford, 749 F.Supp. 1076 (D. Kansas 1990) (providing a long list of states that have implicitly or explicitly upheld claims-made policies).

IPISC did not receive a Claim Form until January 23rd, 2004, and IPISC was subpoenaed by Black Diamond to respond to a request for documents shortly thereafter in February. IPISC has cooperated with Coupons and Coupons' counsel so that Coupons would not be prejudiced in any way by IPISC's responses, and the joint efforts in this regard continue to the present date. However, the Company must decline coverage of the Black Diamond lawsuit, based in part upon the failure of Coupons and/or its agents to submit a CLAIM within the period prescribed by the Policy, and/or within a reasonable or adequate time. We believe that based upon the facts we have, the Company has a valid defense of coverage based upon Coupons' failure to properly and timely notify the Company of a CLAIM, both as a practical matter, and under the contractual terms of the Policy.[1] If you are aware of compelling case law that causes you to believe our position

---

[1] Although the Company might not be required to show actual prejudice in light of the Burns case, supra, the Company has suffered actual prejudice from the lengthy delay in notifying the Company of a CLAIM, in that the suit has been proceeding under the counsel of a firm that the Company would not have approved. The Company's right to approve or disapprove counsel is provided for in the Conditions of the policy, paragraph two, and that policy provision has been upheld in arbitration in California. The firm selected as litigation counsel would not have been approved as litigating counsel, in part, as Mr. Baxter alluded in December of 2002, because that firm had performed a search and opinion of potentially problematic patents in 2002. The Company relied on that opinion in offering increased limits from 1MM to 5MM in coverage, and the firm entirely missed the existence or the relevance of the patents, even though the patents were detectable in the scope of a search of the appropriate class and subclass 705/14, and were issued to a major competitor of Coupons. In his December 27th letter, Chuck Baxter reserved rights to refuse coverage of fees generated by law firms that were not approved.

Also, the Company in general does not approve opining counsel upon whom it relies to extend coverage, because it does not want to reward faulty (and at worst appearance, self-serving) opinion work with reimbursement of litigation fees resulting from the error. Further, when the opinion ultimately is flawed, the Company simply does not want to rely in litigation upon the intellectual property expertise of the firm. In any event, the Company's right under the Policy to disapprove counsel has been affirmed. The fees sought to be reimbursed under the Policy arise from a firm which would not have been approved by the Company as counsel in this matter.

IN 005884

to be in error, please let us know. We believe that the issue should probably be resolved with Marsh's or Crump's E&O carrier. However, this contest is premature, as other bases for denying coverage exist.

We have requested a great deal of information from Ellen Efros regarding the nature of Black Diamond's claim against Coupons, in an effort to determine whether the lawsuit would in fact fall within the scope of the Scheduled Insured Manufactured Product. To this effect, we have requested copies of Coupons' contracts with its customers Consumer Network and SmartSource, depositions of Coupons employees, and most recently, Black Diamond's latest allegations of infringement as noted on a claims chart provided to the court and to Coupons (and IPISC) in May. We have not had time to complete our review of all these materials, particularly the depositions, but in the interest of a prompt response, we are prepared to take a general position with regard to the issue of the nature of the suit and the scope of the Scheduled Insured Manufactured Product.

As previously stated, we believed from a preliminary investigation of the patents in question that Black Diamond could not possibly be asserting in the lawsuit against Coupons that the Scheduled Insured Manufactured Product infringed. A deeper study of the prosecution history, and also the definitions of terms adopted by the court affirmed that suspicion. The insured product specifies that the only means of identifying the user downloading the coupon is either a zip code, or perhaps by implication, a computer identification number. These two means of identification are not within the scope of the asserted patent claims, which require for example, user-specific information and/or unique user identification information. Support is found for this conclusion in the prosecution history of the patents. Nevertheless, and contrary to law, it appears from the claim chart that Black Diamond asserts that a system that merely identifies a user by the computer address or the zip code might also infringe. For example, in Black Diamond's Basis for Infringement of '099 Patent Regarding Bricks Website System, Black Diamond asserts that Coupons provides the element of "user-specific information" by stating that "...the coupons are uniquely associated with a user, for example through one or more of the user/device ID, ...zip code...," etc. (emphasis added).

On the other hand, the main products that are of concern to Black Diamond are clearly the products provided through Consumer Network and SmartSource. The Consumer Network and SmartSource products are not insured, as they specifically exceed the bounds of the specific limitations in the Schedule of Insured Manufactured Products. According to the non-infringement opinion provided by Coupons, each elicits more personal identification information from a user than a United States Postal Service zip code (irrespective of what that information is used for), and thus neither falls within the scope of the Insured product as limited in the Schedule of Insured Manufactured Products. Products that are not specifically scheduled are not MANUFACTURED PRODUCTS, and are not covered under the Policy. As noted on the Addendum to the signed Acceptance Form, material changes to the product must be disclosed and scheduled in order to obtain coverage:

> <u>Item 3. Schedule of MANUFACTURED PRODUCTS to be Insured</u> - This Acceptance Form attaches a Schedule of MANUFACTURED PRODUCTS to be insured

6

IN 005885

REDACTED

and requires your signature before coverage can be bound. <u>Please read this Schedule carefully</u> and understand that if improvements or changes are subsequently made to the Insured Manufactured Products(s), coverage may not apply unless you add these improved or changed MANUFACTURED PRODUCTS to the policy. To add them may require a new search and opinion. Your account representative will be able to assist you in determining the insurability of the improved or changed MANUFACTURED PRODUCTS.

Also, Coupons may have primary indemnification from one or more of its licensees, by contractual agreement. Under the Excess Indemnity clause of the Policy, reimbursement by the Company is considered excess to any other source of indemnification whatever. As a result, only a portion of the lawsuit could be considered for coverage under the Policy, that being the portion addressed to the Scheduled Product, and not the Consumer Network or SmartSource products.

The question also arises whether Black Diamond would have sued Coupons, had Coupons (unbeknownst to IPISC) not strayed from production of the insured product. In other words, if Coupons had sold only the product it disclosed to IPISC, we believe it unlikely that Black Diamond would have determined that it had a strong enough case on that basis alone to proceed against Coupons. Coupons did not inform IPISC at any time that it was selling versions of the insured product with material changes, which changes were clearly more risky with regard to the body of outstanding U.S. patents in the art. The risk of suit by competitors was higher than the Company was led to believe in underwriting, in contemplation of offering coverage, and in increasing policy limits from $1 million/ $2 million aggregate to $5 million/ $5 million in August, 2002. In this regard, we reserve the right to deny coverage.

The Consumer Network and SmartSource products open another issue with regard to coverage, that being Coupons should have known about the patents owned by Black Diamond. IPISC has learned that Coupons provided a product similar to the Consumer News and SmartSource products to a third licensee, Valassis, and Coupons knew Valassis had obtained licenses for the two patents owned by Black Diamond. However, Coupons, perhaps through counsel, failed to conduct a reasonable investigation into whether the similar products created according to the other licensees' specifications would also require a license. Exclusion nine of the Policy states that coverage does not include reimbursement "where the Named Insured knew or reasonably should have known that its manufacture, use, sale or offer for sale of a MANUFACTURED PRODUCT would result in it being charged with INFRINGEMENT" or where the Named Insured knows prior to the Effective Date of the Policy of any patents which could be the basis for allegations of INFRINGEMENT that are not disclosed to the Company. We are not aware of a specific date that Coupons became aware of the patents owned by Black Diamond, except that we understand that this knowledge preceded the Black Diamond lawsuit. As such, the Policy excludes coverage for the Black Diamond matter.

To review, based upon the information provided to date, the bases upon which we rely in denying coverage at the present time are the Exclusion under paragraph nine, and the potential liability of the brokers and/or wholesalers E&O carriers. Other issues to be resolved are approval of counsel, and the proportion of the fees that might be

reimbursable (in light of the contractual indemnification by Coupons' customers, and in light of the proportion of the suit devoted to the Scheduled Insured Manufactured Product). If Coupons provides information that would cause the Company to reconsider denying coverage under Exclusion nine, and all other issues are resolved between Coupons and Indian Harbor, then Indian Harbor would consider interim reimbursement payments according to the terms of the Policy, while liability among the carriers is established.

This statement of the Company's position is without prejudice, and is based upon the information provided to date. The Company may have other defenses or arguments regarding the above issues not mentioned herein, but nevertheless reserved. The Company might also learn facts during the course of litigation that could provide additional bases to deny coverage not described herein. The Company reserves the right to request further information or to raise or supplement any grounds for denying coverage under the Policy in the future, whether or not based upon newly learned information. However, the provisions of the Policy clearly preclude authorization at this point, and thus, we have not asked you to provide any additional information, nor have we taken the time to fully study the depositions provided to us, which information cannot correct the defects precluding authorization, but might provide alternate bases to deny the CLAIM. While in many instances we have cited California law, we do so for purposes of example only, and expressly reserve the right to assert that another state's law governs.

We have addressed this correspondence to you upon Coupons' request. However, we understand that you do not and will not serve as coverage counsel for Coupons. Please communicate our position as outlined in this letter to Jeff Weitzman of Coupons, Inc., and invite his response.

Sincerely,

Robin Fletcher
Claims Department

RLF/wb